UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TECNOGLASS INC., JOSÉ DAES, AND CHRISTIAN DAES,<br><br>      Plaintiffs,<br><br> v.<br><br>CHRISTIAN LAMARCO AND SHADYSIDE PARTNERS, LLC,<br><br>      Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs Tecnoglass Inc., José Daes, and Christian Daes state the following for their Complaint against Defendants Christian Lamarco and Shadyside Partners, LLC (d/b/a Culper Research) (collectively, "Defendants").

**INTRODUCTION**

1.  Culper Research is a serial defamation defendant and the alter ego of Defendant Christian Lamarco. Lamarco is a so-called "short seller" who profits by issuing defamatory "research reports" about public companies in which he has taken a short position and then cashing out when the stock price drops as a result of his "research." Defendants hold Culper Research out as an established investment research company and consistently refer to the royal "We" when conveying the company's defamatory "findings." In reality, however, Lamarco is upon information and belief Culper Research's lone member and sole employee seeking to disguise the fact that the entire company consists of only one person with no discernable, substantial real world work experience to speak of. To this end, each report issued under the Culper Research brand

1

contains a statement on the first page assuring readers that what they are reading is factual and can be relied upon, stating, "all information contained herein is accurate and reliable." Through this charade, Lamarco attempts to engender more credibility among members of the investing public than he deserves, and profits when those readers trust that his "research" about public companies is "accurate and reliable" and trade on the basis of his representations.

2. Plaintiff Tecnoglass is a public company in the construction industry focused on the manufacture of architectural glass and related products. Plaintiffs, brothers José and Christian Daes, are the company's CEO and COO, respectively, and co-founded the company in 1983 in Colombia. Through decades of hard work, the Daes brothers, along with Tecnoglass employees and executives, have built a successful company which has achieved substantial market value.

3. On August 21, 2025, Defendants sought to destroy that hard-earned market value to line Lamarco's pockets at the expense of Plaintiffs and Tecnoglass's employees and shareholders (including, among numerous others, Plaintiffs José and Christian Daes, who together hold a substantial portion of the company's stock through their investment entity). Defendants made Plaintiffs the subject of another one of Lamarco's defamatory "research reports," falsely claiming, among myriad other falsehoods, that the Daes brothers were involved with the operations of the Sinaloa cartel—a major organized crime syndicate—and, more specifically, an illegal campaign finance scheme run by the cartel. That assertion is wildly and demonstrably false. The Daes brothers have nothing to do with the Sinaloa cartel or its alleged illegal campaign finance scheme. Lamarco falsely claimed otherwise, even asserting that Mexican government intelligence had determined the Daes brothers were involved with the Sinaloa cartel's illegal campaign finance scheme. This too was a blatant lie. The source of the so-called Mexican intelligence document Lamarco cited is an anonymous criminal "hacktivist" group that claims to hack government files

to further its activist agenda. That alone raised serious doubts about the document's authenticity and veracity. But Lamarco conveniently and willfully ignored these red flags and misled his readers to believe that the purported hacked document was authentic without taking steps to confirm its reliability, such as by contacting any of the Plaintiffs. Worse still, he did so when the Mexican government itself has publicly and unequivocally made clear that the document was **not** authentic. Lamarco knows this, because Plaintiffs provided him with a Mexican court decision reflecting the government's position, and yet Lamarco has refused to retract his false claims.

4. Sure enough, however, Lamarco's defamatory "research report" had its intended effect: the value of Tecnoglass's shares dropped in intraday trading following its publication. Moreover, Lamarco damaged Plaintiffs' reputations by not only leading his own readers to believe his lies but also, in publicizing his own defamatory statements, foreseeably causing other media outlets across jurisdictions to parrot them in subsequent reporting. Plaintiffs will not sit idly by while Lamarco tarnishes their hard-earned reputations for an undeserved payday. Plaintiffs bring this suit to correct the falsehoods Defendants has promoted, restore their reputations, and recover for the damage Defendants have caused.

## THE PARTIES

5. Plaintiff Tecnoglass Inc. is incorporated in the Cayman Islands, has its global headquarters in Barranquilla, Colombia, and maintains its principal place of business in Miami, Florida.

6. Plaintiff José Daes is domiciled in, and therefore a citizen of (for purposes of diversity of citizenship), Florida.

7. Plaintiff Christian Daes is domiciled in, and therefore a citizen of (for purposes of diversity of citizenship), Florida.

8. Defendant Christian Lamarco is, upon information and belief, a citizen of New York, New York. Upon information and belief, Lamarco is the sole member and owner of Defendant Shadyside Partners, LLC.

9. Defendant Shadyside Partners, LLC, which, upon information and belief, does business as Culper Research, is incorporated in Delaware and, upon information and belief, has its principal place of business in New York, New York. Because Defendant Lamarco is, upon information and belief, the sole member and owner of Shadyside Partners, it is a citizen of New York.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

11. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are citizens of New York and separately pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

12. The Court has personal jurisdiction over Defendant Lamarco because he is a resident of New York. The Court has personal jurisdiction over Defendant Shadyside Partners, LLC, because, upon information and belief, its sole member is a citizen of New York.

## FACTUAL BACKGROUND

A. **Plaintiffs' Success In The Construction Industry**

13. In 1983, brothers José and Christian Daes founded what would later become publicly traded company Tecnoglass Inc. Today, Tecnoglass manufactures architectural glass and

associated aluminum and vinyl products for the global commercial and residential construction industries.

14. José Daes is the Chief Executive Officer of Tecnoglass and a member of its board of directors.

15. Christian Daes is the Chief Operating Officer of Tecnoglass and a member of its board of directors.

16. Tecnoglass supplies over 1,000 customers in North, Central and South America. Its customers include developers, general contractors or installers for hotels, office buildings, shopping centers, airports, universities, hospitals and multi-family and residential buildings.

17. Tecnoglass's tailored, high-end products are found on some of the world's most distinctive properties, including the Aston Martin Residences (Miami), Miami World Tower (Miami), 3ELEVEN (New York), Raffles Hotel (Boston), Norwegian Cruise Line Terminal B (Miami), One Thousand Museum (Miami), Paramount Miami Worldcenter (Miami), Salesforce Tower (San Francisco), and AE'O Tower (Honolulu).

18. Tecnoglass has successfully established a leading reputation in the construction market in Florida, where its headquarters are located and where sales comprised 89% of Tecnoglass's U.S. revenue in the year ended December 31, 2024. In recent years, Tecnoglass has successfully grown its geographic presence in the U.S. outside of Florida, particularly into markets along the east coast, and as a result, nearly 16% of the company's U.S. backlog is for projects outside of Florida.

19. Through their decades of hard work, José and Christian Daes have achieved reputations for excellence in the business community. Indeed, *Fortune Magazine* ranked Tecnoglass as the 27th fastest-growing company in the United States for 2024 based on

Tecnoglass' strong revenue growth, earnings per share growth, and three-year annualized return to shareholders for the period ended June 30, 2024.

20. José and Christian Daes are also known for their philanthropic contributions. Under their leadership, Tecnoglass has sponsored the Tecnoglass ES Windows Foundation, which has allocated resources to initiate and support various regional development projects. In 2024, the foundation's scholarship program allowed over 530 students to pursue higher education at Colombian universities. The foundation has also supported local educational entities and organizations pursuing societal change and community enhancement. The foundation's home improvement program has supported the ability of Tecnoglass group employees to enhance their homes or purchase their own, ensuring the well-being of their families. During 2024, the foundation delivered more than 107 housing improvements.

B. **Culper Research's History Of Profiteering From Defamation**

21. Upon information and belief, Defendant Lamarco founded Defendant Shadyside Partners, LLC (d/b/a Culper Research) in 2019, two years after he obtained an undergraduate degree in finance from Grove City College and without substantial work experience.

22. Defendants' website, www.culperresearch.com, holds Culper Research out as a firm that specializes in investigative reporting, stating, "we take an exhaustive, investigative approach to investment research," and "[w]e seek to expose companies which have misrepresented their operations, failed to disclose significant risks, misused capital, possess accounting irregularities, or otherwise deceived investors."

23. Under the brand of Culper Research, Defendants author and publish reports that they make available on the Culper Research website, www.culperresearch.com, under the heading, "Latest Research." Upon information and belief, since its founding, Culper Research has issued

ten or fewer so-called research reports per year, targeting a small number of public companies in which Lamarco has taken a "short" position, meaning that he has engaged in an investment strategy such that he stood to make a **profit** if the company's stock value **declined**.

24. Upon information and belief, Lamarco writes the reports made available on the Culper Research website with the goal that the report will cause the price in the stock of the company that is the subject of the report to drop so that Lamarco can make a profit.

25. Upon information and belief, Lamarco is the sole member and owner of Shadyside Partners, LLC d/b/a Culper Research, and Culper Research has no other employees.

26. Notwithstanding the apparent absence of other members or employees, Lamarco has held Culper Research out as if it is an established investment research organization and not a one-man operation. For example, since its founding in 2019, reports that Culper Research has issued characteristically refer to "we" in describing Culper Research's findings, such as in describing what "we" have found. The public profile for Culper Research's account on the social media platform X, @CulperResearch, has also historically referred to "we" in describing Culper Research's activity. Upon information and belief, Lamarco began referring to "we" in describing his work under the Culper Research brand in order to falsely position the company and its research reports as more credible than those written by someone who was just two years out of college and had no substantial real world working experience, which is who Lamarco was at the time he founded Culper Research. In reality, the "we" at Culper Research is, upon information and belief, really just Lamarco.

27. Lamarco—under the guise of Culper Research—has openly bragged about the damage that he claims his reports have caused to public companies. For example, the public profile for Culper Research's account on X includes the below post, dated February 14, 2024, in which

7

Defendants appear to take credit for the vast decline in stock value in three different public companies that have been subject of Culper Research's reports, and warning that its next target would "also end[] in shambles":



28. Similarly, the public profile for Culper Research's account on X includes the below post, dated September 27, 2023, in which Defendants similarly took credit for drastic drops in the stock prices of ten different public companies.



29.     In another example, the public profile for Culper Research's account on X includes the below post, dated March 20, 2024, in which Culper Research likens itself to the Grim Reaper, further demonstrating Defendants' extreme ill will toward public companies and their executives and employees—like Plaintiffs—that become subject of Defendants' reports.



30.     Defendants have been sued for defamation multiple times, but appear to treat such lawsuits as just a cost of doing business. Each time—in contrast to their usual willingness to publicly take credit for the decline in value of the stocks they target—Defendants cynically argue that the drop in the stock's price was due **not** to their defamatory report but to other market factors.[1]

---

[1] *E.g., LifeMD, Inc. v. Lamarco*, Case No. 2:21-cv-01273, ECF No. 7 at 5 (W.D.Pa. Oct. 12, 2021) (Lamarco's motion to dismiss stating, "This nearly 60% decline preceded, and therefore had nothing to do with, the publication of the Article"); *Gorilla Technology Group, Inc. v. Shadyside Partners, LLC*, Case No. 1:25-cv-03142, ECF No. 21 at 1 (S.D.N.Y. June 5, 2025) (Lamarco's motion to dismiss stating, "Gorilla's stock price had already plummeted from $44.15 to $18.99 per

9

C.     **Defendants Seek To Profit From Spreading Falsehoods About Plaintiffs**

31.    On August 21, 2025, Defendants targeted Tecnoglass and its leadership, authoring and publishing a premeditated defamatory report titled, "Tecnoglass (TGLS): From Barranquilla to Sinaloa," which Defendants made publicly available on the Culper Research website, www.culperresearch.com (the "Defamatory Report") and promoted on the public profile page of the X account for Culper Research, @CulperResearch.

32.    Defendants publicly refer to the Defamatory Report as "research," for instance, by making it available on a portion of the www.culperresearch.com website titled "Latest Research."

33.    Upon information and belief, sometime prior to publishing the Defamatory Report, Lamarco (whether acting through Shadyside Partners, LLC, individually, or a separate entity) acquired an interest in a financial asset whereby he would obtain a profit in the event that the price of Tecnoglass shares were to **decrease**. Indeed, the Defamatory Report states, "[w]e are short Tecnoglass Inc.," which is financial industry jargon meaning that Defendants had engaged in an investment strategy such that they would profit if the company's stock price declined.

34.    The Defamatory Report begins with a statement, labeled a "disclaimer," stating, among other things, "[t]o the best of our ability and belief, **all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable**" (emphasis added).

35.    The Defamatory Report then includes numerous false and defamatory statements of and concerning Plaintiffs including—among others—statements conveying the false assertion that Plaintiffs are involved in the illegal activities of the Sinaloa cartel, which the Defamatory

---

share – a 57% decline – prior to the Report's publication, whereas the fluctuation following the Report's publication was approximately $2 a share—dramatically less. The idea, as alleged, that Gorilla's troubles were necessarily caused by the Report is simply implausible …").

10

Report describes as a "major drug cartel[]" that President Trump directed the State Department to designate as a "terrorist organization[]."

36. For example, the Defamatory Report includes the following false and defamatory statements of and concerning Plaintiffs (herein together the "Defamatory Report Statements"):

- "Tecnoglass CEO & COO Jose & Christian Daes Alleged to Aid Sinaloa Cartel Illicit Financing Schemes, According to Recently Leaked Intelligence Memos"

- "We are short Tecnoglass Inc. ('TGLS', 'the Company') because we uncovered new evidence that links Tecnoglass insiders – including its CEO and COO Jose and Christian Daes – to Sinaloa cartel operations in Colombia.  In late 2022 and 2023, Mexican hackers leaked a cache of Mexican intelligence reports which detailed the Sinaloa cartel's 'illicit financing of the presidential campaign of the Republic of Colombia.' The leaked documents were meant to be redacted, but by simply highlighting, copying, and pasting the 'redacted' text, we found **that Tecnoglass brothers Jose and Christian Daes were named explicitly as two of the eight businessmen who allegedly participated in this scheme**" (original emphasis).

- "In late 2022 and 2023, Mexican hackers leaked a cache of Mexican intelligence reports which detail how a group of Colombian businessmen laundered Sinaloa cartel funds to finance Colombian elections. The leaked documents were meant to be redacted, but we found that by simply highlighting, copying, and pasting the 'redacted' text into a new document, **Tecnoglass brothers Jose and Christian Daes were named explicitly as two of the eight businessmen involved in the Sinaloa-funded scheme**" (original emphasis).

11

- "In what follows, we detail new, previously unreported evidence that we believe ties Tecnoglass and the Daes brothers to the infamous Sinaloa cartel and widespread corruption along Colombia's Caribbean coast."

- "Tecnoglass Executives Jose and Christian Daes Named by Mexican Intelligence as Involved in Sinaloa Cartel Election Scheme".

- "In late 2022 and 2023, Mexican hackers leaked six terabytes of data from Mexican military and defense agencies, initially published by Colombia's leading news radio network, W Radio. The Mexican government confirmed the leaks, now referred to as the 'Guacamaya Leaks.' … The intelligence reports detailed various aspects the Sinaloa Cartel's criminal operations inside of Colombia, including their 'infiltrating the financial and political system' via 'illicit financing' schemes, resulting in the cartel seizing 'consolidated control of at least three of Colombia's main ports: Cartagena, Barranquilla, and Santa Marta. Recall that Tecnoglass is headquartered in Barranquilla, and most of its product flows through the Barranquilla port, according to import/export records. More particularly, the memos described: … A 'back-to-back' scheme whereby, in short, Sinaloa cartel funds would be funneled to politicians as loans, and the debt from the politician would be repaid on their behalf by Barranquilla businessmen, **including Jose and Christian Daes, utilizing the proceeds of corrupt contract awards**" (original emphasis).

37.     Also on August 21, 2025—the same day that Defendants published the Defamatory Report to the Culper Research website—Defendants also posted the following false and defamatory statement to the public profile for the Culper Research account on X, @CulperResearch, accompanied by a hyperlink to the Defamatory Report on the Culper Research website: "NEW: We are short Tecnoglass $TGLS - recently leaked intelligence memos name

12

$TGLS CEO and COO Jose and Christian Daes as participants in Sinaloa cartel schemes in Colombia; $TGLS board also ensnared; massive fallout risk ignored." The same day, Defendants published a follow-up reply comment to the aforementioned post on the Culper Research account on X, which was also accessible from the account's public profile page and displayed alongside the aforementioned statement, falsely stating: "3) In 2022-23, hackers leaked a cache of Mexican intelligence docs, in which officials allege Sinaloa-funded Colombian election schemes. The docs were poorly redacted - our simple copy/paste reveals $TGLS execs Jose and Christian Daes were called out by name as participants." These two statements are referenced together herein as the "Defamatory X Posts."

38. The Defamatory Report Statements and the Defamatory X Posts are reasonably understood by readers to convey the assertion that Tecnoglass, José Daes, and Christian Daes are connected to and involved with a drug cartel, specifically the Sinaloa cartel, and have participated in its illegal operations, including an illegal election finance scheme and other acts of corruption; and that a report of a Mexican government intelligence unit tied Plaintiffs to the Sinaloa cartel and its illegal election finance scheme. Moreover, readers reasonably understood Defendants to be conveying factual assertions by such statements, particularly given that the Defamatory Report begins at the outset by stating that "all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable."

39. The Defamatory Report Statements and the Defamatory X Posts are false in multiple respects. First, Tecnoglass, José Daes, and Christian Daes are not, and never have been, connected to or involved in any way with, the Sinaloa cartel or its operations. More specifically, Plaintiffs have never been involved with any illegal election finance scheme or other acts of unlawfulness or corruption involving the Sinaloa cartel. Second, Defendants' statements are

further false because the purported report of a Mexican government intelligence unit cited by the Defamatory Report Statements and the Defamatory X Posts that purportedly ties Plaintiffs to the Sinaloa cartel and its illegal election finance scheme (herein the "Fabricated Mexican Intelligence Report") is fabricated and does not reflect any actual statements or conclusions by the Mexican government or any intelligence unit within or official of the Mexican government.  Indeed, the Mexican government has publicly and unequivocally made clear that the Fabricated Mexican Intelligence Report is not authentic.

40. Defendants nonetheless represented the Fabricated Mexican Intelligence Report as if it were real, describing it in the Defamatory Report as part of "a cache of Mexican intelligence reports" that were leaked by "Mexican hackers."  The Defamatory Report further states, "The Mexican government confirmed the leaks, now referred to as the 'Guacamaya Leaks.'"

41. By asserting that the "Mexican government confirmed the leaks," Defendants expressly misled their readers to believe that the Fabricated Mexican Intelligence Report, specifically, was authentic and part of the recognized hack and resulting leak, when, in fact, the Mexican government has specifically confirmed the opposite.  Defendants' "disclaimer" at the start of the Defamatory Report—in which they state "all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable"—likewise served to communicate Defendants' endorsement of the Fabricated Mexican Intelligence Report as an authentic and genuine government document.

42. Upon information and belief, Defendants privately entertained serious doubts as to the authenticity of the Fabricated Mexican Intelligence Report prior to publishing the Defamatory Report and, in spite of these doubts, publicly endorsed the document's authenticity without taking any additional steps to confirm whether the Fabricated Mexican Intelligence Report was real.  For

example, Defendants claimed in the Defamatory Report that the Fabricated Mexican Intelligence Report had been obtained through the work of a group of hackers and linked to a Wikipedia entry for "Guacamaya (hacktivist group)" that described the group as "an international group of hackers that has published anonymous reports and leaked sensitive files" and had "hacked major corporations and the governments of Chile, Colombia, El Salvdador, Guatemala, Mexico, and Peru."  The Wikipedia entry further noted that the group "says they're motivated by anti-imperialism and environmentalism, and that they fight against transnational corporations and external intervention in Latin America, singling out extractivism and the armed forces and the defense of natural resources and native communities'".  Thus, Defendants were aware that the source of the Fabricated Mexican Intelligence Report was an anonymous criminal outlet that had taken credit for vast and extreme acts of criminality in the name of an activist agenda bent on damaging the subjects of the documents they claimed to have obtained through illegal hacking operations through the public disclosure of such documents.

43. These red flags were known to Defendants and gave them substantial reason to doubt the veracity and authenticity of the Fabricated Mexican Intelligence Report.  Nonetheless—evincing their reckless disregard for the truth—Defendants represented the document as accurate and reliable without taking further steps to confirm that representation such as, for example, contacting any of the Plaintiffs to inquire further.

44. Indeed, information that was publicly available at the time of and leading up to the publication of the Defamatory Report confirmed that the Fabricated Mexican Intelligence Report was **not** authentic, accurate, or reliable.  The Mexican government itself publicly and unequivocally made clear in court filings that the document was not authentic.

15

45. On August 26, 2025, counsel for Plaintiffs wrote Defendants a letter informing them, among other things, that the Defamatory Report's statements accusing Plaintiffs of being involved in the Sinaloa cartel's alleged illegal campaign finance scheme, or any other aspect of the Sinaloa cartel, were false, and demanding that Defendants issue a retraction. As part of that letter, Plaintiffs' counsel provided Defendants with a decision issued by a court in Mexico (and a corresponding English translation) reflecting that the Mexican government had confirmed that the Fabricated Mexican Intelligence Report is not authentic.

46. After receiving Plaintiffs' demand for a retraction and evidence demonstrating that the Fabricated Mexican Intelligence Report is a fake, Defendants refused to issue a retraction and continued to make the Defamatory Report Statements and Defamatory X Posts publicly available online.

**FIRST CAUSE OF ACTION**
Defamation
(On Behalf Of Each Plaintiff Against Each Defendant)

47. Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1-46 as if set forth fully herein.

48. On August 21, 2025, Defendants published or caused to be published the Defamatory Report Statements to the publicly-accessible Culper Research website, www.culperresearch.com, and published or caused to be published the Defamatory X Posts to the publicly-accessible profile page for Culper Research on X, @CulperResearch, both of which contained unprivileged false assertions of fact of and concerning Plaintiffs Tecnoglass, José Daes, and Christian Daes.

49. The Defamatory Report Statements and the Defamatory X Posts are defamatory per se because they impute serious criminal misconduct to the Plaintiffs, injure them in their trade or profession, or describe conduct, characteristics or condition incompatible with the proper exercise

of a lawful business, trade, or profession, and otherwise subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace.

50. No reasonable person under the circumstances would have published the Defamatory Report Statements and the Defamatory X Posts.

51. Defendants published or caused to be published the Defamatory Report Statements and the Defamatory X Posts negligently and/or with knowledge that they were false and/or with reckless disregard for the truth or falsity of the Defamatory Report Statements and the Defamatory X Posts.

52. Upon information and belief, Defendants published or caused to be published the Defamatory Report Statements and the Defamatory X Posts with the specific intent to cause harm to Plaintiffs, showing willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, justifying an award of punitive damages.

53. As a direct and proximate result of the Defamatory Report Statements and the Defamatory X Posts, Plaintiffs have suffered presumed, actual, and special damages, including humiliation, damage to reputation, lost business opportunities, and other pecuniary damage.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Tecnoglass Inc., José Daes, and Christian Daes respectfully request that the Court enter judgment and relief in their favor, and against Defendants, as follows:

A. Award Plaintiffs compensatory, actual, and presumed damages in amounts to be proven at trial;

B. Award Plaintiffs presumed and special damages in amounts to be proven at trial;

C. Award Plaintiffs punitive and/or exemplary damages in an amount to be proven at trial;

D. Award Plaintiffs their reasonable expenses, including but not limited to reasonable costs and attorneys' fees incurred to mitigate the harm caused by Defendants' defamatory and tortious conduct, including without limitation the fees incurred in seeking retraction of Defendants' false and defamatory statements and money spent on efforts to counteract the negative impact of Defendants' defamatory statements on Plaintiffs' reputations;

E. Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action to restore their reputations;

F. Issue a narrowly-tailored injunction that (i) requires Defendants to remove and retract all of the Defamatory Report Statements and Defamatory X Posts that are adjudicated by this Court to be defamatory and (ii) prohibits Defendants from repeating and republishing all such statements.

G. Award Plaintiffs all costs, disbursements, fees, and pre- and post-judgment interest as permitted by law;

H. Award Plaintiffs such and other additional remedies as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs Tecnoglass Inc., José Daes, and Christian Daes demand a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all claims and issues so triable.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
| Dated: New York New York<br>September 9, 2025 | By: */s/ Alex Spiro*<br>Alex Spiro<br>Cory D. Struble<br>Michael R. Bloom<br>295 Fifth Avenue<br>New York, New York 10016<br>Tel: (212) 849–7000<br>Email: alexspiro@quinnemanuel.com<br>corystruble@quinnemanuel.com<br>michaelbloom@quinnemanuel.com<br><br>*Attorneys for Tecnoglass Inc., José Daes, and Christian Daes* |

19